# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE )
)
v. ) I.D. No. 2507004298
)
MARHI CLARK, )
)
Defendant. )

Submitted: January 22, 2026
Decided: January 23, 2026

*Upon Defendant's Motion Pursuant to 10 Del. C. § 1011 to Transfer Charges to the Family Court*

**GRANTED.**

## ORDER

Stephen McCloskey, Esquire, Deputy Attorney General, DEPARTMENT OF JUSTICE, 820 North French Street, Wilmington, DE 19801, Attorney for the State of Delaware.

Meghan Crist, Esquire, Assistant Public Defender, 820 North French Street, Wilmington, DE 19801, Attorney for Defendant Marhi Clark.

**WHARTON, J.**

This 23rd day of January, 2026, upon consideration of Defendant Marhi Clark's Motion Pursuant to 10 *Del. C.* § 1011 to Transfer Charges to the Family Court, it appears to the Court that:

1. Defendant Mahri Clark ("Clark") is charged by indictment with Robbery First Degree, Conspiracy Second Degree, and Possession of a Firearm by a Person Prohibited ("PFBPP"). He seeks to transfer these charges to Family Court under 10 *Del. C.* §1011. A reverse amenability hearing was held on January 22, 2026. Testifying at the hearing for the State was Det. Thomas Rittenhouse ("Det. Rittenhouse") of the Wilmington Police Department in support of the State's effort to make out a *prima facie* case against Clark. Also testifying for the State was Juvenile Probation and Aftercare Specialist Brittany Briggs ("Specialist Briggs") who presented the recommendation of the Division of Youth Rehabilitative Services ("DYRS") that Clark's case should remain in Superior Court. Testifying for Clark was Jaymes Fairfax-Columbo, JD, PHD, who recommended that Clark's case be returned to Family Court. The Court received reports authored by Dr. Fairfax-Columbo and Specialist Briggs.

2. While juvenile crimes are usually handled in Family Court,[1] this Court maintains original jurisdiction over juveniles, aged 16 and older, who commit certain

---

[1] *State v. Anderson*, 385 A.2d 738, 739 (Del. Super. Ct. 1978).

enumerated crimes.[2]  These crimes include, as here, Robbery First Degree where the offense involved the display of what appeared to be a deadly weapon and the defendant has previously been adjudicated delinquent of one or more felony level offenses.[3]  Despite having jurisdiction, this Court has the discretion to transfer these charges to Family Court if it finds such a transfer to be in the interest of justice.[4]  At the time of the alleged offenses on July 5, 2025, Clark, whose date of birth is April 23, 2008, was 17 years of age.

3.     Before making a decision where a juvenile's charges should be tried, and upon petition from the juvenile, this Court must hold a reverse amenability hearing and weigh the factors set forth in 10 *Del. C.* §1011(b).  The purpose of this hearing is to place a judicial check on the prosecutorial charging of juveniles.[5]  "Since a juvenile charged with a designated felony in the Superior Court has lost the benefit of Family Court adjudication by statutory pronouncement, there is [a] presumption that a need exists for adult discipline and legal restraint. Hence, the burden is upon the juvenile to demonstrate the contrary."[6]

---

[2] *Id.* at 739–40 (citing 10 *Del. C.* §938, redesignated as 10 *Del. C.* §1010 and amended by 69 Laws 1993, ch. 335, §1, eff. July 8, 1994). *See also* 10 *Del. C.* §921.
[3] 10 *Del. C.* §1010(a)(1).
[4] 10 *Del. C.* §1011(b).
[5] *See State v. Anderson*, 697 A.2d 379, 383 (Del. 1997) (citations omitted).
[6] *Anderson*, 385 A.2d at 740 (citation omitted).

4. Before addressing § 1011(b)'s factors, "this Court must preliminarily determine whether the State has made out a *prima facie* case against the juvenile[.]"[7] The Court considers "whether there is a fair likelihood that [the defendant] will be convicted of the crimes charged."[8] Furthermore, "[a] real probability must exist that a reasonable jury could convict the juvenile based on the totality of the evidence, assuming that the evidence introduced at the [reverse amenability] hearing is unrebutted by the juvenile at trial."[9]

5. Based on the evidence presented at the reverse amenability hearing, the Court finds that there is no real probability that a reasonable jury could find Clark of the Robbery First Degree charge, the sole charge vesting this Court with original jurisdiction. Det. Rittenhouse is the chief investigating officer in this case which was originally reported as a shooting occurring on July 5, 2025 at approximately 10:57 p.m. The shooting occurred at 5th and Madison Streets near the William "Hicks" Anderson Community Center in Wilmington. Near where the victim was found were two live rounds of 9mm ammunition and a number of 9mm shell casings. The victim was transported to Christiana Medical Center in critical condition.

6. It appears only a single surveillance camera in the area produced any evidence of value. A surveillance camera from the community center showed a

---

[7] *State v. Harper*, 2014 WL 1303012, at *5 (Del. Super. Ct. March 31, 2014) (citing *Marine v. State*, 624 A.2d 1181, 1185 (Del. 1993)).
[8] *Id.*
[9] *Id.* (citation omitted).

group of people walking toward the victim and then, 30 seconds later, running away from him toward W. 6th Street. It appeared to Det. Rittenhouse that one of the group fired a shot back at the victim. The quality of the surveillance footage was insufficient to allow for any identifications.

7.    Det. Rittenhouse first tried to interview the victim at the hospital, but found him too medicated. He was more successful in speaking to him on July 7th. During that interview, approximately nine minutes of which were not recorded on Det. Rittenhouse's body worn camera at the victim's request, the victim provided a description of what he alleges happened. He said he got to the park near the community center at about 9:00 p.m. with a friend. At some point, he began to feel uncomfortable when a group of about ten individuals approached him. One of the group told him to "stop and give up what you got." That comment was made during the unrecorded portion of the interview and not repeated in subsequent interviews. What the victim had was a cell phone and a gun, which he claimed belonged to his brother. He grabbed his waistband where the gun was and ran but was shot in his hand and leg. The firearm was stolen after he was shot.

8.    The victim was unable to identify the shooter, but said the "twins" were involved, although he did not specify their roles.[10] Det. Rittenhouse was able to identify the "twins" as Clark and his twin brother, Amir, both of whom the victim identified in separate photo spreads. Further investigation revealed, however, that

---

[10] At least Det. Rittenhouse did not testify that he specified their roles.

Amir was incarcerated at the time of the shooting. In a subsequent interview in August, the victim said he had had heard Amir was incarcerated and possibly just thought both were there.

9. In the course of the investigation, Det. Rittenhouse executed various search warrants for Clark's residence, a hotel where he was staying, and a cell phone believed to belong to him. The only potentially incriminating evidence were Instagram photographs linking Clark to codefendant Jermaine Rainey ("Rainey"). A search of Rainey's phone produced photographs of Clark and Rainey hours after the shooting both possessing a firearm. The stolen gun was never recovered, nor was any ballistic, DNA, fingerprint, or other forensic evidence developed against Clark.

10. Ultimately, Det. Rittenhouse was able to conduct a post-Miranda interview of Clark. At first, he denied any knowledge of the incident, offering his girlfriend as an alibi witness. Later, he admitted being at the park with his girlfriend when the shooting happened, but denied being part of the group that threatened the victim. He did say he was talking to the victim about a phone charger before the victim was shot though. He admitted grabbing/picking up the victim's gun and taking off with it after the shooting. After first saying he threw it in the ocean, he said he left it on Beatty Place, a nearby alley.

11. The robbery count against Clark reads:

> MARHI CLARK and JERMAINE RAINEY, on or about
> the 5th day of July, 2025, in the County of New Castle,

6

> State of Delaware, when in the course of committing theft, did use or threaten the immediate use of force upon N.P., with intent to prevent or overcome resistance to the taking of property or to the retention thereof immediately after the taking, and displayed what appeared to be a firearm, a deadly weapon, or represented by word or conduct that one, the other, or both or another person were/was in possession of a firearm, a deadly weapon, as that term is defined under Title 11, Section 222 of the Delaware State Code of 1974, as amended.

During argument, the State was asked to explain its theory of Clark's criminal liability for Robbery First Degree, as opposed to the simple theft of the firearm. It acknowledged that it was unable to offer evidence that Clark removed the firearm from the victim's person by force or threat of force. It had no evidence that Clark took the gun off of the victim's person as opposed to picking it up off the ground. The State posited, however, that Clark's possession of the firearm immediately after he stole it was evidence that he intended to threaten to use force to prevent or overcome resistance to the retention of the firearm immediately after he took it. The problem with that argument is that there is no evidence in the record to support it. The victim, who was critically wounded, certainly offered no evidence regarding what Clark intended to do in the unlikely event he offered any resistance to Clark taking his gun. Likewise, Clark never told Det. Rittenhouse that he intended to use the firearm to threaten the victim to prevent him from resisting the taking. He simply said he ran away.

12. The Court concludes it is far more probable, based on the evidence presented at the hearing, that a reasonable jury would convict Clark of

7

Theft of a Firearm rather than Robbery First Degree. The State has not met its burden of making out a *prima facie* case against Clark on the robbery charge. Because there is no charge against Clark enumerated in 10 *Del. C.* § 1010(a)(1) for which the State can make out a *prima facie* case, this Court lacks original jurisdiction. Further, for the same reason, this Court need not consider the factors set out in § 1010(b).[11]

**THEREFORE,** Defendant Mahri Clark's Motion Pursuant to 10 *Del. C.* § 1101 to Transfer Charges to Family Court is **GRANTED.** The case is transferred to Family Court.

**IT IS SO ORDERED.**

*/s/ Ferris W. Wharton*
Ferris W. Wharton, J.

---

[11] Had the Court been required to consider the 1010(b) factors, however, it would have been hard pressed to retain jurisdiction. Clark presented a thorough exposition of his position through the testimony of Dr. Fairfax-Columbo that discussed his extensive testing, review of the available records, and interviews with Clark, his mother and others. The State, on the other hand, put Specialist Briggs in the uncomfortable position of simply being the vehicle through which the recommendation of her supervisors at DYRS was presented.